IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DAWN McCULLOUGH

                      Plaintiff,

        v.

MICHAEL J. ASTRUE, Commissioner of Social
Security Administration,

                    Defendant.

CV-10-6117-ST

FINDINGS AND
RECOMMENDATION

STEWART, Magistrate Judge:

## **INTRODUCTION**

Plaintiff, Dawn McCullough ("McCullough"), brings this action pursuant to 42 USC

§§ 405(g) and 1383(c)(3), seeking judicial review of a final decision of the Commissioner of

Social Security denying her application for Supplemental Security Income ("SSI") disability

benefits under Title XVI of the Social Security Act ("Act" or "SSA").  For the reasons set forth

below, the Commissioner's decision should be affirmed.

///

## PROCEDURAL BACKGROUND

McCullough applied for SSI on October 4, 2004, alleging a disability since April 1, 2001, due to depression, lower back pain, weak ankles and swollen legs.[1]  Tr. 71, 84-85, 136, 154.  The application was denied, and McCullough requested reconsideration.  Tr. 37-39, 42-46.  After denial of the request for reconsideration, McCullough timely requested a hearing.  Tr. 35.   A hearing was held before Administrative Law Judge ("ALJ") John J. Madden, Jr., on January 31, 2007, and a supplemental hearing was held on October 25, 2007.  Tr. 332-69, 374-97.

On November 15, 2007, the ALJ found that McCullough was not disabled and therefore not entitled to SSI.  Tr. 13-29.  The Appeals Council denied McCullough's request for review of the ALJ's decision.  Tr. 5-8.  The Appeals Council decision is a final decision of the Commissioner, subject to review by this court.  20 CFR § 410.670a.[2]

Because SSI benefits are not payable "for any period that precedes the first month following the date on which an application is filed," 20 CFR § 416.501, the relevant period in this case is October 4, 2004 (the date of filing), through November 15, 2007 (the date of the ALJ's decision).

## STATEMENT OF FACTS

### I.  Vocational History

McCullough was 32 years old on the date of her application.  Tr. 71.  She completed the

---

[1]  Citations are to the page(s) indicated in the official transcript of record filed on January 7, 2011 (docket #10).

[2]  McCullough first applied for Title XVI benefits on March 22, 2001, but her application was denied on July 28, 2004, and dismissed by the Appeal's Council as untimely on November 30, 2004.  The ALJ in the present case decided not to reopen and revise the March 22, 2001 application because he found no basis to reopen the claim. *See* 20 CFR § 416.1488 *et seq.* That decision is final and binding.  Tr. 16.

seventh grade and received a GED in 1998.  Tr. 89.  She worked briefly in 2001 as a customer

service representative.  Tr. 85.

## II.  Medical Impairments

### A.  Back Pain

McCullough saw Michael Pylman, M.D., at South Coast Orthopaedic Associates on

January 13, 2004, for back pain.  Tr. 211-12.  Dr. Pylman noted that McCullough had a ten year

history of back pain stemming from a fall down a flight of stairs.  Tr. 211.  McCullough

explained that her worst pain is in her low back which extends down her left leg.  *Id.*  Dr. Pylman

concluded the MRI of the lumbar spine was within normal limits and assessed lumbar

radiculopathy with myelopathy.  Tr. 212.  On February 4, 2004, McCullough received a lumbar

epidural.  Tr. 207.   She received another injection on July 21, 2004, after returning with similar

complaints of back pain.  Tr. 203-04.  When the pain persisted, another MRI was taken on

August 16, 2004, which concluded:  "No evidence for disc protrusion or herniation is seen at any

of the lumbar levels.  There is no spinal stenosis and the marrow space appears preserved."

Tr. 198.  On September 7, 2004, McCullough saw Frances Shireman, M.D., after a motor vehicle

accident on August 11, 2004, in which she injured her neck.  Tr. 181.  She reported low back

pain radiating down both legs.  *Id*.  McCullough told Dr. Shireman that South Coast

Orthopaedics Associates was unable to determine the cause of her pain.  *Id*.  On October 13,

2004, McCullough received another injection from Dr. Pylman.  Tr. 195.

On May 19, 2005, after a period out-of-state, McCullough saw Shaun M. Hobson, M.D.,

complaining of back pain and significant numbness and tingling extending down the left lower

extremity.  Tr. 190.  On May 25, 2005, she reported to Jeffrey K. Bert, M.D., that she had an

injection in January 2005 which made her worse.  Tr. 255.  Based on a physical examination, he

formed the impression that she had "back pain with no objective findings."  Tr. 258.  In his plan

for her care, he stated:  "We are going to give her the benefit of the doubt, and once more order

an MRI.  If it is normal, then I would refer her to chronic pain management and perhaps

psychiatric evaluation."  *Id*.  An MRI on June 2, 2005, found "mild degenerative change at L5-S1

with ventral disc bulge is a little more prominent now . . . with no other interval change seen."

Tr. 253.  On July 18, 2005, Dr. Bert read her MRI "as basically unremarkable.  [McCullough] is

complaining of a lot of discomfort.  She is having some issues with her family doctor providing

her pain medication.  I think the best approach would be to have her see Dr. Pylman for pain

management . . . ."  Tr. 252.  McCullough saw Dr. Pylman again on September 13, 2005, who

opted to prescribe the opiates, Cymbalta and Neurontin.  Tr. 251.

        Another MRI a year later on October 12, 2006, showed no "significant interval change"

with only moderate degeneration of the L5-S1 disc and moderate right lateral recess stenosis.

Tr. 242.  However, on November 13, 2006, Dr. Bert noted that McCullough "has clear

radiculopathy today with sciatica with a  positive Spurling's in her left buttock. . . . On MRI, I

read this as an L5-S1 disc herniation with a marked degenerative disc at this level with also right

lateral recess stenosis. . . . I am going to recommend decompression and fusion because of her

size, weight, and age."  Tr. 241.

        At the October 25, 2007 hearing, McCullough testified that her back pain had

progressively gotten worse, making it hard to sleep at night.  Tr. 378-79.  Getting up on a daily

basis made her back pain worse.  Tr. 279.  Before she could have the surgery, McCullough was

required to quit smoking.  Tr. 338.  As of January 31, 2007, she had reduced her smoking but had

not yet quit.  *Id.*

   **B.  Ankle Pain and Instability**

   McCullough saw Jon S. Davis, M.D., on January 13, 2004, complaining of left ankle

pain.  Tr. 209-10.  He noted her history of an arthoscopy in June 2003 for a loose body and

debridement of synovitis.  Tr. 209.  After that procedure she still complained of pain laterally on

the foot.  *Id*.  Upon examination, Dr. Davis found that she had a "pretty significant pes planus"

(flatfoot) and was hyperpronating.  *Id*.  He diagnosed her with a lateral impingement, secondary

to hyperpronation with lateral ankle laxity, secondary to multiple strains.  *Id*.

   McCullough saw Shaun M. Hobson, M.D., on July 30, 2004, and discussed surgery for

her ankle pain which he felt could restore stability but likely not markedly improve pain.

Tr. 201-02.  On August 24, 2004, Dr. Shireman noted McCullough's history of ankle pinning.

Tr. 183.  He found her ankle joint unstable due to a previous surgery and noted that McCullough

was aware that she should be wearing a brace.  Tr. 184.  She reported that she was able to walk

for exercise.  Tr. 185.  When McCullough saw Dr. Shireman again on September 29, 2004, for a

preoperative evaluation, he noted that she "gets up and down from the table quite well, limited

somewhat by her obesity."  Tr. 179.

   On November 30, 2004, Dr. Hobson performed surgery to repair the ligaments of her left

ankle.  Tr. 160-61.  A week later McCullough reported that she was feeling better and had

stopped taking her pain medication.  Tr. 194.  She also explained that she was moving out-of-

state.  *Id.*

   After returning to Oregon from Texas, McCullough saw Dr. Hobson on May 5, 2005, and

reported that she had fallen and injured her ankle.  Tr. 191.  A couple weeks later, McCullough

reported that her ankle was doing "quite a bit better" and her pain was at a 2 out of 10.  Tr. 190.

At the October 25, 2007 hearing, McCullough testified that her ankle stability had

improved but a constant ache continued.  Tr. 379**.**

### C.  Tendinitis of Wrist and Left Hand

McCullough saw Jon S. Davis, M.D., for wrist pain on March 22, 2004.  Tr. 206.  He

assessed tendinitis of the wrist and gave her an injection for the pain.  *Id*.  On October 6, 2006,

she saw Alan L. Whitney, M.D., with continuing complaints of pain in her left wrist and also

describing numbness in her palm and the dorsal aspect of her hand.  Tr. 245.  The nerve

conduction tests were within normal limits, rendering the etiology of her complaints unclear.

Tr. 246.  He recommended "re-evaluation in four to six months if she continues to have trouble"

and noted "an extensive amount of psychological overlay, which makes evaluation difficult."

Tr. 247.

At the October 25, 2007 hearing, McCullough testified that she was having problems

with both wrists and experiencing pain when moving her hands and also experiencing difficulty

in working on the computer.  Tr. 381.

### D.  Neck Pain

McCullough complained of neck discomfort to Dr. Bert on January 15, 2007.  Tr. 259.

The x-rays showed "some straightening of the cervical spine and a little degeneration at C5-6, but

no gross neurological deficit to examination of her upper extremities."  *Id*.

### E.  Chronic Obstructive Pulmonary Disease

Dr. Shireman prescribed an inhaler on August 24, 2004, to treat McCullough's chronic

obstructive pulmonary disease.  Tr. 184.  On September 7, 2004, she had coarse breath sounds

but no wheezing, rales or rhonci.  Tr. 181.  At another appointment on April 1, 2005, she had

coarse breathing but also mild wheezing consistent with COPD and chronic bronchitis.  Tr. 178.

### F.  Abnormal Cardiac Testing

Dr. Hobson noted on September 7, 2004, that McCullough's electrocardiogram "shows

inferior Q waves with ST segment changes.  She admits that she has been an IV meth user in the

past but again denies any cardiac incidences that she is aware of."  Tr. 181.  On December 1,

2004, after the ankle surgery, Dr. Davis commented that while she had an abnormal EKG, 2D

echo was normal.  Tr. 158.

### G.  Headaches

McCullough reported headaches to Dr. Pylman in January 2004 (Tr. 211) and to

Dr. Shireman in August 2004.  Tr. 183.  After a car accident later that month, she reported

increased headaches.  Tr. 179.  In December 2004, she continued to have bilateral, bifrontal

headaches, resolved only by sleep, and Dr. Shireman diagnosed her with tension type headaches.

Tr. 158-59.    ### H.  Obesity

In December 2004, Dr. Shireman noted that McCullough was five foot three inches in

height and weighed 220 pounds.  Tr. 158.  This placed her at a higher risk for venous thrombosis

during her recovery from ankle surgery.  *Id*.

## III.  Psychological Impairments

McCullough has received mental health counseling and medication through Coos County

Mental Health ("CCMH") and obtained medication through her primary care provider.  Tr. 184,

187-88, 260-330.  She had been previously enrolled at CCMH in 1996 and again in 1997.

Tr. 316.  In April 2005, she contacted CCMH regarding increased stress, sleep problems, and

depression.  Tr. 187.  She received mental health counseling at CCMH at least from September

2006 through August 2007 before moving out-of-state.  Tr. 284-330.  On December 14, 2006,

Nurse Practitioner Joanne Rutland saw McCullough and described her history of major

depressive disorder, borderline personality disorder, likely social phobia and /or panic disorder.

Tr. 260-61.  At that time, she had been trying different antidepressants.  *Id*.  Ms. Rutland changed

her medications at that time and again in May 2007.  Tr. 260, 302.

In August 2007, McCullough contacted CCMH while out-of-state about renewing

medications because she was unable to secure a provider in Nevada or Washington.  Tr. 283.  At

that time, Qualified Mental Health Associate Cindy Bengston summarized McCullough's

diagnoses as:  major depressive disorder, moderate recurrent; history of dysthymia; social phobia;

poly-substance dependence in partial remission; asthma; headaches; sleep apnea; bone spurs;

arthritis; indigestion; and history of anemia.  Tr. 282.

## SEQUENTIAL DISABILITY ANALYSIS

Disability is the "inability to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death

or which has lasted or can be expected to last for a continuous period of no less than 12

months[.]"  42 USC § 423(d)(1)(A).  The initial burden of proof rests upon the claimant to

establish his or her disability.  *Roberts v. Shalala*, 66 F3d 179, 182 (9th Cir 1995), *cert denied*,

517 US 1122 (1996) (citations omitted). The ALJ engages in a five-step sequential inquiry to

determine whether a claimant is disabled within the meaning of the Act.  20 CFR §§ 404.1520,

416.920.  Below is a summary of the five steps, which also are described in *Tackett v. Apfel*,

180 F3d 1094, 1098-99 (9th Cir 1999):

At step one, the Commissioner determines whether the claimant is engaged in substantial gainful activity.  If so, the claimant is not disabled.  If not, then the Commissioner proceeds to step two.  20 CFR § 416.920(b).

At step two, the Commissioner determines whether the claimant has one or more severe impairments.  If not, the claimant is not disabled.  If the claimant has a severe impairment, then the Commissioner proceeds to step three.  20 CFR § 416.920(c).

At step three, the Commissioner determines whether the claimant's impairment "meets or equals" one of the impairments listed in the SSA regulations, 20 CFR Part 404, Subpart P, Appendix 1 ("Listing of Impairments").  If so, the claimant is disabled.  If the impairment does not meet or equal one of the listed impairments, then the Commissioner proceeds to step four. 20 CFR § 416.920(d).

If the adjudication proceeds beyond Step Three, the Commissioner must determine the claimant's residual functional capacity ("RFC").  The RFC is an assessment of the sustained work-related activities the claimant can still do on a regular and continuing basis, despite the limitations imposed by his or her impairments.  20 CFR §§ 416.920(e), 416.945; Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996).

At step four, the Commissioner determines whether the claimant is able to perform work she has done in the past.  If so, the claimant is not disabled.  If the claimant demonstrates he or she cannot perform work done in the past, the Commissioner proceeds to step five.  20 CFR § 416.920(e).

Finally, at step five, the Commissioner determines whether the claimant is able to do any other work.  If not, the claimant is disabled.  If the Commissioner finds the claimant is able to do

other work, the Commissioner must show a significant number of jobs exist in the national

economy that the claimant can do.  The Commissioner may satisfy this burden through the

testimony of a vocational expert ("VE") or by reference to the Medical-Vocational Guidelines,

20 CFR Part 404, Subpart P, Appendix 2.  If the Commissioner demonstrates a significant

number of jobs exist in the national economy that the claimant can do, then the claimant is not

disabled.  If the Commissioner does not meet this burden, the claimant is disabled.  20 CFR

§ 416.920(f).

       At steps one through four, the burden of proof is on the claimant.  *Tackett*, 180 F3d at

1098.  However, at step five, the burden shifts to the Commissioner to show that the claimant can

perform jobs that exist in significant numbers in the national economy.  *Id.*

## ALJ'S FINDINGS

       At step one, the ALJ concluded that McCullough had not engaged in substantial gainful

activity since her application date of October 4, 2004.  Tr. 18.

       At step two, the ALJ determined that McCullough had the severe impairments of left

ankle instability, status post surgery; chronic obstructive pulmonary disease, with normal

pulmonary function tests; obesity; dysthymia; and personality disorder, NOS, by history.  *Id*.

       At step three, the ALJ concluded that McCullough does not have an impairment or

combination of impairments that meets or equals any of the listed impairments.  *Id*.  The ALJ

found that McCullough had the RFC to lift and carry 20 pounds occasionally and 10 pounds

frequently; stand or walk two hours in an eight hour work day; and sit up to six hours in an eight

hour work day.  Tr. 20.  He limited pushing and pulling to the weight she can carry and limited

her to no climbing of ladders, ropes, or scaffolds and occasional climbing of ramps, stairs,

stooping, crouching, or crawling.  *Id*.  He included no manipulative limitations, but found that

she should avoid exposure to irritants like strong industrial solvents as a prophylactic measure

due to chronic obstructive pulmonary disease.  *Id.*

At step four, the ALJ found that McCullough had no past relevant work.  Tr. 27.

At step five, based on the testimony of a vocational expert ("VE"), the ALJ concluded

that considering McCullough's age, education, and RFC, she was capable of performing

sedentary or light, unskilled occupations of stuffer (representative occupation of DOT No.

731.685-014), document preparer (representative occupation DOT No. 249.587-018), cash clerk

(representative occupation of DOT No. 211.462-010) and counter clerk (representative

occupation of DOT No. 249.366-010).[3]  Tr. 28, 387-89.

Accordingly, the ALJ concluded that McCullough was not disabled at any point through

the date of the decision on November 15, 2007.  Tr. 29.

## <u>STANDARD OF REVIEW</u>

District courts have the power to affirm, modify or reverse the decision of the

Commissioner, with or without remanding the case.  42 USC § 405(g).  The decision whether to

remand for further proceedings or for immediate payment of benefits is within the discretion of

the court.  *Harman v. Apfel*, 211 F3d 1172, 1178 (9th Cir), *cert denied*, 531 US 1038 (2000).  The

issue turns on the utility of further proceedings.  *Id*.

The Commissioner's decision must be affirmed if it is based on proper legal standards

and the findings are supported by substantial evidence in the record as a whole.  42 USC

---

[3]  "The Dictionary of Occupational Titles ("DOT") includes information about jobs (classified by their exertional and skill requirements) that exist in the national economy."  20 CFR § 416.969.

§ 405(g); *see also Andrews v. Shalala*, 53 F3d 1035, 1039 (9th Cir 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews*, 53 F3d at 1039. The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision. *Martinez v. Heckler*, 807 F2d 771, 772 (9th Cir 1986) (citations omitted). The Commissioner's decision must be upheld, however, even if "the evidence is susceptible to more than one rational interpretation." *Andrews*, 53 F3d at 1039-40.

## FINDINGS

### I. Credibility

The ALJ found McCullough's "statements concerning the intensity, persistence and limiting effects of her conditions are not entirely credible" due to "an absence of medical evidence to support the constant, persisting physical and mental limitations that [she] has alleged" and to her inconsistent daily activities. Tr. 22.

#### A. Legal Standards

The ALJ must consider all symptoms and pain which can be "reasonably accepted as consistent with the objective medical evidence, and other evidence." 20 CFR §§ 404.1529(a), 416.929(a). Once a claimant shows an underlying impairment which may "reasonably be expected to produce pain or other symptoms alleged," absent a finding of malingering, the ALJ must provide "clear and convincing" reasons for finding a claimant not credible. *Lingenfelter v. Astrue,* 504 F3d 1028, 1036 (9th Cir 2007), citing *Smolen v. Chater*, 80 F3d 1273, 1281 (9th Cir 1996). The ALJ's credibility findings must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v.*

*Shalala*, 50 F3d 748, 750 (9th Cir 1995), citing *Bunnell v. Sullivan*, 947 F2d 341, 345-46 (9th

1991) (*en banc*).  The ALJ may consider objective medical evidence and the claimant's treatment

history, as well as the claimant's daily activities, work record, and observations of physicians and

third parties with personal knowledge of the claimant's functional limitations.  *Smolen*, 80 F3d at

1284.  The ALJ may additionally employ ordinary techniques of credibility evaluation, such as

weighing inconsistent statements regarding symptoms by the claimant.  *Id.*  The ALJ may not,

however, make a negative credibility finding "solely because" the claimant's symptom testimony

"is not substantiated affirmatively by objective medical evidence."  *Robbins v. Soc. Sec. Admin.*,

466 F3d 880, 883 (9th Cir 2006).

    **B.  <u>Malingering</u>**

    Evidence of malingering relieves the ALJ from the burden of providing specific, clear,

and convincing reasons to discount claimant's testimony.  *Baghoomian v. Astrue*, 319 Fed Appx

563, 565 (9th Cir 2009); citing *Smolen*, 80 F3d at 1281.

    Defendant points to evidence in the record of malingering by McCullough.  In May 2005,

treating physician Dr. Bert reported that McCullough rose from her chair "in a histrionic manner"

and "will not bend for me."  Tr. 256.  During her motor examination, he listed various

components as "5/5 with encouragement" and noted a negative straight leg raise "when she is

distracted."  Tr. 257.

    Although this may be of evidence malingering, Dr. Bert did not so conclude and the ALJ

did not so find.  Thus, the ALJ must provide clear and convincing reasons to make an adverse

credibility finding.

///

.    **C.  Analysis**

   **1.  Objective Evidence**

The ALJ found no objective evidence in the record to support some of McCullough's

subjective complaints or any clinical basis to substantiate her pain.  Tr. 25.  Though lack of

objective evidence alone is not enough to make an adverse credibility finding, it may be a clear

and convincing reason when combined with other reasons.  *See* 20 CFR § 416.929(c)(2) ("[W]e

will not reject your statements about the intensity and persistence of your pain or other symptoms

or about the effect your symptoms have on your ability to work . . . solely because the available

objective medical evidence does not substantiate your statements.").

   Due to back pain commencing in 2001, McCullough described her physical limitations in

her October 4, 2004 application as an inability to sit or stand for long periods of time with

chronic pain radiating down her left leg.  Tr. 85.  She later explained in 2007 that her back had

gotten worse and it was harder to go from sitting to standing.  Tr. 378-79.  Her medical records,

however, provide no objective medical evidence to support this alleged pain until, at the earliest,

November 2006.

   Dr. Pylman's records from January 13, 2004, indicate that McCullough had experienced

back pain for at least ten years and an MRI of the lumbar spine was within normal limits.

Tr. 211.  Nonetheless, without any supporting objective findings, he assessed her with "lumbar

radiculopathy with myelopathy" and treated her with epidural injections for her back pain from

February to July 2004.  Tr. 204, 212.  Moreover, the August 16, 2004 MRI showed "no evidence

for disc protrusion or herniation" and "no spinal stenosis."  Tr. 198.  A month later, Dr. Shireman

noted that despite treatment for her back pain, "she gets up and down from the table quite well,

limited somewhat by her obesity."  Tr. 179.

In May 2005, after McCullough filed her application for SSI, Dr. Bert found "positive Waddell's, over the lower lumbar spine"[4] and "5/5 with encouragement" for each point on the motor examination assessment and formed the impression of "back pain with no objective findings."  Tr. 257-58.  If the MRI was normal, he intended to "refer her to chronic pain management and perhaps psychiatric evaluation."  Tr. 258.  That MRI was "basically unremarkable."  Tr. 252.

About a year and a half later on October 12, 2006, Dr. Pylman again assessed lumbar radiculopathy and myelopathy and recommended another lumbar MRI.  Tr. 243.  That MRI showed no significant abnormalities.  Tr. 242.  However, on November 13, 2006, Dr. Bert read that MRI as showing "an L5-S1 disc herniation with a marked degenerative disc at this level with also right lateral recess stenosis" and recommended decompression and fusion.  Tr. 241.  Yet he noted no functional limitations.  Tr. 243.  As the ALJ correctly observed, there are no treatment records related to McCullough's back after November 2006.  Tr. 22.  The only record mentioning back pain is by Dr. Bert on January 25, 2007, in connection with McCullough's neck pain and need to stop smoking prior to any lumbar surgery.  Tr. 259.

The ALJ concluded that "except for the isolated recommendation of Dr. [Bert][5] in November 2006 for back surgery caused by herniated disc, the other treating physicians provided

---

[4]  Waddell signs are "a group of inappropriate responses to physical examination."  *See* MLS Medical Reference, *Waddell Signs*, https://www.mls-ime.com/articles/GeneralTopics/Waddell%20Signs.html (last visited August 24, 2011).

[5]  The ALJ named Dr. Shandelmeir, not Dr. Bert, as making this recommendation.  The ALJ likely was confused by the notation at the bottom of the record showing that a copy was sent to Dr. Schandelmeir.  This error is harmless.

no medical diagnosis of the back, and instead found that there was an absence of clinical findings

to support her pain complaints." Tr. 25. That conclusion is reasonable based on the record.

Despite McCullough's repeated complaints of back pain in 2004 and 2005, her doctors were

unable to identify its source through examination or testing. Although Dr. Bert read the October

2006 MRI as indicating disc herniation, it was read differently by another doctor. Tr. 242-43.

The medical records even suggest some skepticism of her complaints, as Dr. Pylman opted to

"give her the benefit of the doubt."

### 2. Daily Activities

The ALJ stated that McCullough's "level of activity during this adjudication, contravenes

the notion that she is unable to function due to physical pain as alleged." Tr. 25. He added that

her "activities demonstrate that she is more active than she has alluded to, i.e., taking [*sic*] her

care giving for her boyfriend's mother, walking daily and taking multiple trips to the store to get

exercise, and going fishing." Tr. 26.

An ALJ may find a claimant not credible if his daily activities are inconsistent with his

alleged limitations. *Tomasetti v. Astrue*, 533 F3d 1035, 1039 (9th Cir 2008). However, "[t]he

Social Security Act does not require that claimants be utterly incapacitated to be eligible for

benefits." *Fair v. Bowen*, 885 F2d 597, 603 (9th Cir 1989). "[I]f a claimant is able to spend a

substantial part of his day engaged in pursuits involving the performance of physical functions

that are transferable to a work setting, a specific finding as to this fact may be sufficient to

discredit an allegation of disabling excess pain." *Id.*

Contrary to McCullough's assertion of disability due to chronic back pain, depression,

and weak ankles, she reported that she was a caregiver to her boyfriend's grandmother[6] through

July 2006, which required her at times to wake up at night as needed to provided assistance.

Tr. 260.  At an exam on October 6, 2006, Dr. Whitney noted that she had a "normal activity and

energy level."  Tr. 246.  At the January 31, 2007 hearing, she testified that she drives her

ex-boyfriend to work daily and her children to school.  Tr. 359-60.  She reported in March 2007

that she walked her child daily to the bus stop and was able to focus at the computer for periods

of time but limited herself to three hours a day.  Tr. 304.  In May 2007 she reported walking daily

for exercise and taking multiple trips to the store.  Tr. 183, 296.

McCullough also moved to Kansas in late December 2004 (Tr. 193), to Texas in 2005,

(Tr. 178, 187), to Nevada later that year (Tr. 191, 279), to Washington in 2007 (Tr. 281, 283),

and in July 2007, back to Nevada.  Tr. 284, 285, 290.  While she was in Nevada, DeEtta Hillius,

her stepmother, described her as being very limited in activity and spending much of the days on

the couch in pain.  Tr. 157.  However, the ALJ discredited Hillius' testimony, and McCullough

does not challenge that finding.

Given these activities of care-giving, regular driving, walking, and computer use, it was

rational for the ALJ to conclude that McCullough's daily activities were inconsistent with her

allegations.

### 3.  Failure to Cooperate

The ALJ noted that McCullough "failed to appear at psychological examinations

scheduled by DDS."  Tr. 22.  In fact, she failed to appear on three occasions.  She had a mental

---

[6]  The ALJ referred to the boyfriend's mother while Rutland referred to the boyfriend's grandmother.  This discrepancy is immaterial since they are both referring to the same activity.

status exam scheduled on February 9, 2005, for which she did not appear, noting later that she

was sick. Tr. 216. The exam was rescheduled for March 15, 2005, but she did not attend.

Tr. 216. She also had a psychodiagnostic exam scheduled for August 30, 2005. Tr. 214.

However because McCullough did not confirm that she would appear, as requested, the exam

was subsequently cancelled. Tr. 214. McCullough left a message with DDS inquiring about her

exam, but when returning her call, the agency was unable to reach her at the number she had

provided. Tr. 214. DDS also made three unsuccessful attempts to obtain the Form SSA-827

("Authorization to Disclose Information to the Social Security Administration"). Tr. 156.

An ALJ may consider a claimant's failure to cooperate in assessing credibility. *See*

*Tommasetti v. Astrue*, 533 F3d 1035, 1039 (9th Cir 2008); *Thomas v. Barnhart* , 278 F3d 947,

959 (9th Cir 2002) ("[Claimant's] efforts to impede accurate testing of her limitations supports

the ALJ's determinations as to her lack of credibility."), citing *Rautio v. Bowen*, 862 F2d 176,

179 (8th Cir 1988) (determining that failure to cooperate during examinations supported ALJ's

conclusion that claimant was not credible). Thus, the ALJ properly concluded that

McCullough's failure to participate in these exams and to complete the required form was a

failure to cooperate in the development of her claim and diminished her credibility.

### 4. <u>Work History</u>

In support of the ALJ's adverse credibility determination, defendant points to his finding

that McCullough:

> has not [*sic*] past relevant work. Her earnings record show[s] only $2,200
> of lifetime earnings, working, seeking work, or seeking vocational services
> or training have not been significant aspects of her adult life. Thus, the
> focus must be on the issue of whether the claimant can work, not whether
> she wants to.

Tr. 28.

A poor work history may negatively impact a claimant's credibility. *Thomas,* 278 F3d at 959. Defendant argues it is a reasonable interpretation of the ALJ's decision that he used this minimal work history to discount her credibility. *See Magallanes v. Bowen*, 881 F2d 747, 755 (9th Cir 1989). However, the ALJ made this statement at step five of his decision, and not as a reason to discredit McCullough with respect to the RFC determination. Accordingly, it cannot be reasonably inferred that the ALJ included this work history to his credibility evaluation.

### 5. <u>Conclusion</u>

Substantial evidence in the record supports the ALJ's findings that the objective evidence does not support McCullough's allegations of significant back pain, that her daily activities were inconsistent with her allegations, and that she failed to cooperate in the development of her claim. Since these findings are clear and convincing, the ALJ did not err to discount McCullough's allegations concerning her symptoms and pain.

## II. <u>Allegations of Pain Due to Other Impairments</u>

McCullough argues that in evaluating her allegations of pain, the ALJ failed to address her back pain, wrist tendinitis, left ankle instability, tension headaches, and obesity. The ALJ is only required to discuss significant, probative evidence. *Vincent v. Heckler*, 739 F2d 1393, 1394-95 (9th Cir 1984). As previously discussed, the ALJ properly considered and discounted McCullough's allegations of back pain. The remaining allegations are addressed next.

In March 2004, Dr. Davis diagnosed tendinitis of the wrist. Tr. 206. He gave her an injection of steroids and did "not see much else to be done here, as far as surgery" and decided to "leave her alone." *Id.* In October 2006, Dr. Whitney reviewed her x-rays, found the nerve

conduction tests within normal limits, and concluded that her etiology was unclear. Tr. 246. He had insufficient evidence to consider her for surgery and found an "evaluation difficult" due to "an extensive amount of psychological overlay." Tr. 247. Moreover, the state agency physician found no manipulative limitations (Tr. 221), and McCullough's application alleges no problems using her hands. Tr. 84-85, 91, 105, 124. Thus, the ALJ did not err in failing to address McCullough's tendinitis.

McCullough argues the ALJ failed to consider pain associated with her left ankle instability. The ALJ did find that the left ankle instability was a severe impairment and in his RFC limited her to standing or walking two hours in an eight hour work day. Tr. 18, 20. The record supports this limitation with respect to her ankle. McCullough had surgery for her ankle on November 30, 2004. Tr. 160. A few days after her procedure, she felt better and had stopped taking pain medication. Tr. 194. In May 2005, her ankle was doing well, and Dr. Hobson saw no need to see her again. Tr. 192. After taking some falls a few months later, Dr. Hobson saw her again on December 21, 2005, and commented that her x-rays looked "much better than expected" and that her gait and stance were within normal limits. Tr. 248-49. At her January 31, 2007 hearing, she stated that her ankle stability was fine and she could deal with the pain. Tr. 355. At her October 25, 2007 hearing, she reported that the stability has improved. Thus, there is no credible evidence that the left ankle impairment caused any greater functional limitations than found by the ALJ.

McCullough's complaints of tension headaches are mentioned periodically in the medical records. Tr. 211 (January 2004 by Dr. Pylman), 179 (September 2004 by Dr. Shireman), 158-59 (December 2004 by Dr. Shireman), 256 (May 2005 by Dr. Bert), 248 (December 2005 by

Dr. Hobson).  However, McCullough does not allege any functional limitations from headaches, and headache pain is a subjective complaint which the ALJ may reject based on his credibility findings.

As for obesity, the ALJ did find it that was a severe impairment.  Tr. 18.  However, McCullough argues that the ALJ erred by not considering its effects on her back pain, particularly in the 2006 MRI.

The SSA recognizes that obesity can cause limitations of function, with the actual limitations dependent on various factors specific to the individual.  SSR 02-1p at *6.  "An assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment. . . .  In cases involving obesity, fatigue may affect the individual's physical and mental ability to sustain work activity."  *Id.*   However, the SSA:

> will not make assumptions about the severity or functional effects of obesity combined with other impairments.  Obesity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment.  We will evaluate each case based on the information in the case record.

*Id*.

The claimant has the burden of providing evidence as to how his obesity limits his functioning.  *Burch v. Barnard*, 400 F3d 676, 683 (9th Cir 2005).

The ALJ explained that while McCullough "has some functional limitations associated with her obesity, there is no medical evidence to support her pain complaints persisting at the level, duration, or intensity that she described."  Tr. 25.  McCullough did not allege any difficulties or impairments due to her obesity.  Tr. 84-85, 91.  In any event, because complaints

of pain and fatigue are subjective complaints, the ALJ properly disregarded these based on his adverse credibility determination.

## III.  Step Five

McCullough argues the ALJ erred at step five because the RFC failed to include all of her limitations.  First, she argues that because the RFC limited her to standing or walking for less than two hours, the positions of cash clerk and counter clerk were eliminated.  However, the VE qualified that the number of these positions available in the national economy would be limited, not that these positions would be eliminated entirely.  Tr. 393.  Only positions of house cleaner and janitor would be eliminated.  *Id.*

Second, McCullough argues that the RFC did not include limitations related to her wrist tendinitis, anxiety and anger issues, need for rest breaks after every hour of work, and difficulty concentrating and persisting at tasks for up to two hours at a time.  However, the ALJ rejected these limitations previously based on his credibility analysis.  Thus, McCullough's RFC and the accompanying hypothetical questions to the VE are supported by the record.

## RECOMMENDATION

Based on the foregoing, the decision of the Commissioner should be AFFIRMED and the case should be DISMISSED.

///

///

///

///

///

**<u>SCHEDULING ORDER</u>**

Objections to the Findings and Recommendation, if any, are due September 19, 2011.  If no objections are filed, then the Findings and Recommendation will be referred to a district judge and go under advisement on that date.

If objections are filed, then a response is due within 10 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will be referred to a district judge and go under advisement.

DATED this 1st day of September, 2011.


s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge